*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
November 19, 2019

Plaintiff-Appellee,

v

No. 343798
Kalamazoo Circuit Court
LC No. 2017-001093-FC

ZACHARY MICHAEL PATTEN,

Defendant-Appellant.

Before: MURRAY, C.J., and MARKEY and BECKERING, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), carrying a concealed weapon (CCW), MCL 750.227, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to life imprisonment without the possibility of parole for the murder conviction, two to five years' imprisonment for the CCW conviction, and two years' imprisonment for the felony-firearm conviction. On appeal, defendant argues that he was denied the effective assistance of counsel, that there was insufficient evidence to support the murder conviction, and that evidence produced from a search of his vehicle should have been suppressed. On review of defendant's arguments, we conclude that they do not merit reversal. Accordingly, we affirm.

In an attempt to shoot the father of his girlfriend's two children, defendant missed the man and instead struck the man's sister, killing her with a single gunshot wound to the chest. The siblings had been sitting on the front porch of a home in Kalamazoo when defendant drove up in his car, got out, directed angry remarks at the intended target, whom he had previously threatened; he then drew and discharged his firearm, returned to his vehicle, and sped away. Multiple witnesses at the crime scene identified defendant as the perpetrator. After defendant left the scene, he drove down to St. Joseph County where he went to the home of his ex-wife and

-1-

promptly shot and killed her husband with whom he had a volatile relationship.[1] Defendant was stopped by police later that night in South Bend, Indiana, for operating a vehicle while intoxicated, at which time his car was searched and police recovered a handgun and ammunition. The following day, after defendant had been released from a hospital, he walked up to a couple of South Bend police officers and admitted that he had committed the Michigan murders the previous evening, including one in which he attempted to shoot a man but instead struck his sister. A detective from Kalamazoo interviewed defendant, and defendant confessed that he shot the woman even though he had been aiming at her brother. Defendant told the detective that "things had kind of been building up for [him] over the past six months and he just got to a point where he couldn't take it anymore." A bullet recovered from the crime scene was consistent with the handgun found in defendant's car.

The evidence was overwhelming that defendant shot and killed the victim. Defense counsel requested a competency examination, and the trial court granted the request. A state competency evaluation of defendant was conducted at the Department of Health and Human Services Center for Forensic Psychiatry. As reflected in a competency evaluation, the examining doctor opined that defendant was competent to stand trial.[2] Following a competency hearing, the district court entered an order finding that defendant was competent to stand trial.[3] Defense counsel did not pursue a criminal responsibility evaluation or an insanity defense.[4] While defense counsel argued to the jurors that they needed to hold the prosecutor to her burden of proof, counsel never suggested that defendant did not shoot the victim. Rather, in closing argument, defense counsel posited that the homicide did not amount to first-degree murder, as the case did not involve premeditation and deliberation. Defendant was convicted as indicated above.

On appeal, defendant argues that defense counsel was ineffective in failing to request an independent evaluation of defendant's competence to stand trial and by failing to investigate

---

[1] The trial court allowed the introduction of this evidence as other-acts evidence under MRE 404(b). The homicide resulted in a separate murder conviction in St. Joseph County, which defendant has appealed to this Court in Docket No. 349597; the appeal remains pending. The admission of the other-acts evidence is not challenged on appeal.

[2] The competency evaluation was not made part of the lower court record, but defendant attached it to his brief on appeal. The prosecution references it, citing to defendant's attached exhibit, without objection. Under MCR 7.216(A)(4), this Court has the discretionary authority, "on terms it deems just," to "permit amendments, corrections, or *additions* to the transcript or record[.]" (Emphasis added.) We now exercise that authority and shall consider the competency evaluation as an addition to the record.

[3] Although the order indicated that a competency hearing took place, the record does not contain a transcript of the hearing.

[4] According to defendant, his attorney in the murder prosecution in St. Joseph County did seek a criminal responsibility evaluation, which ultimately evaluated defendant criminally responsible. Defendant points out various alleged shortcomings in that evaluation.

defendant's mental health history, which would have revealed that he required medication to deal with depression and bipolar disorder. Defendant further contends that counsel was ineffective where, in spite of defendant's extensive mental health history and the facts of the case indicating that he was legally insane when the killing occurred, counsel failed to investigate and raise the defense of insanity.

Because defendant did not raise these claims in the trial court in a motion for new trial or motion for evidentiary hearing, our review is limited to mistakes apparent from the record. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000). This Court denied defendant's motion to remand for an evidentiary hearing, but the Court did so without prejudice to the case call panel examining whether remand is necessary. *People v Patten*, unpublished order of the Court of Appeals, entered January 22, 2019 (Docket No. 343798).

Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error while we review de novo issues of constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), the Michigan Supreme Court recited the principles applicable to claims of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Citations and quotation marks omitted.]

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

The decision whether to pursue an insanity defense is generally a matter of trial strategy for which we will not substitute our judgment for that of counsel. *People v Newton (After Remand)*, 179 Mich App 484, 492; 446 NW2d 487 (1989). We cannot, however, insulate the review of counsel's performance by simply calling it trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Initially, this Court must determine whether strategic choices were made after less than complete investigation, with any choice being reasonable only to the extent that reasonable professional judgment supported the limitations on investigation. *Id.*; see also *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015).

With respect to the issue of defendant's competency to stand trial on the charged offenses, MCL 330.2020(1) provides:

A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

With respect to the defense of legal insanity, the Legislature enacted MCL 768.21a, which provides:

(1) It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in . . . MCL 330.1400[5], . . . that person lacks substantial capacity either to appreciate the nature and quality of the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness . . . does not otherwise constitute a defense of legal insanity.

(2) An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances.

(3) The defendant has the burden of proving the defense of insanity by a preponderance of the evidence.

Dr. Thomas Brewer performed the competency examination. The evaluation noted that medical records from a variety of mental health facilities had been requested, but "they were not considered critical to the competency to stand trial opinion." Dr. Brewer conducted a 2¾-hour clinical interview of defendant. Defendant also participated in "[p]sychological testing consisting of the Personality Assessment Inventory (PAI) and the Structured Inventory of Malingered Symptomatology (SIMS)[.]" Additionally, Dr. Brewer had a telephone consultation with defense counsel regarding defendant and the case. Finally, Dr. Brewer reviewed the felony complaint and the police investigation report concerning the offenses.

---

[5] "Mental illness" is defined as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 330.1400(g).

-4-

In a section of the competency evaluation regarding mental status and clinical condition, which included a discussion of the PAI and SIMS tests and results, Dr. Brewer came to the following conclusions:

> In summary, Mr. Patten presented as a man of low average to average intelligence, and significantly depressed mood and whose presentation appeared to be free of indications suggestive of hallucinations or delusional beliefs. However, toward the end of the evaluation the defendant endorsed experiencing auditory hallucinations, visual hallucinations, and feelings of paranoia. Again, these claims did not match the defendant's presentation. Psychological testing strongly supported the view that Mr. Patten was feigning psychiatric, neurological, cognitive and amnestic disorders. However, even with the apparent feigning of problems, it was my assessment that at the time of the evaluation the defendant was manifesting symptoms suggestive of a depressive disorder.

The evaluation then addressed defendant's psychological history, noting at the end of that section that defendant "denied receiving any mental health treatment as a child, juvenile, or adult." On the issue of competency to stand trial, Dr. Brewer wrote:

> Regarding the defendant's capacity to assist in his defense in a rational manner, Mr. Patten understood the charges against him and understood that a trial was an adversarial process. He indicated that he had met with his attorney, and at this early juncture was not aware of any difficulties in working with the defense attorney. He understood the defense attorney was there to help him and that he must help his attorney. At the time of the evaluation, Mr. Patten demonstrated his ability to sit through, attend to and to participate appropriately in the forensic evaluation, which suggests to me that he could manifest the same capabilities at the time of a trial. The defendant did report a lack of memory for some of the time period surrounding the alleged offense; however, he attributed these memory problems to his consumption of alcohol, rather than any neurological issue. Two factors which could complicate Mr. Patten's ability to assist in his defense in a rational manner are first of all his apparent passive personality, and secondly his current level of depression. These factors contribute to Mr. Patten being slow in his responses and in his effort. Because of this, I have made a request that the . . . [j]ail evaluate the defendant for medication, and if this were to occur, it is quite possible that his mood could improve somewhat. However, while it is my opinion that Mr. Patten could likely benefit from a lessening of his depression, it is my opinion that he nonetheless does at this time possess the capacity to assist in his defense in a rational manner.

Dr. Brewer opined that defendant was competent to stand trial.

Defendant argues that in 2014, when he was going through a divorce, he sought and received mental health treatment to address thoughts of suicide, depression, sleep problems, and mood swings. Defendant claims that an assessment revealed that he needed assistance with impulse control, depression, anxiety, and anger management. According to defendant, he

reported to his therapist that he had thoughts of "killing everyone" and that he was consistently hearing voices in his head that told him to hurt people. Defendant contends that he was diagnosed at the time with intermittent explosive disorder and major depressive disorder with psychotic features. He was prescribed Abilify and Brintellix. In support of these claims, defendant attached to his brief on appeal documents from 2014 showing that he was a patient at a community counseling center. Defendant also points to 2017 text messages from defendant's ex-wife to defendant's girlfriend in which she claimed that defendant can become "unstable or severely angry" when not taking his medications "or ends up in the mental hospital." In her texted responses, defendant's girlfriend indicated that she had never observed such behavior in defendant, and she asked defendant's ex-wife about when defendant had stayed in a psychiatric hospital. Defendant's ex-wife mentioned that he had been in a psychiatric hospital when he was 16 or 17 years old.[6] Additionally, defendant argues that he had not taken any medication from 2015 until he was committed into the custody of the Michigan Department of Corrections (DOC) after trial and sentencing. Defendant attaches DOC records showing that defendant takes Zoloft, Depakote, and Remeron, arguing that this reveals that he has mental health issues that were not being attended to at the time of the murders.

None of the mental health history and information discussed in the preceding paragraph is contained in the record.[7] Defendant maintains that this mental health history would have been easily discoverable had defense counsel made even a minimal effort at exploring the issues of competency and criminal responsibility. Defendant argues that his mental health history, when considered in conjunction with the facts surrounding the circumstances of the offenses, support a conclusion that he was not competent to stand trial and was legally insane. Thus, defense counsel was ineffective for failing to seek an independent competency evaluation and by failing to pursue an insanity defense.

Assuming that defendant's mental health history is properly before us, which it is not, reversal or remand is unwarranted. With respect to the issue of competency to stand trial, defendant asserts that defense counsel should not have accepted Dr. Brewer's evaluation but should instead have sought an independent competency evaluation given defendant's mental health history, which counsel failed to investigate. We first note that defendant informed Dr. Brewer that he never had any mental health treatment; consequently, we can only speculate whether defendant would have told counsel about any past treatment had counsel made an inquiry, and assuming he failed to do so. Also, we do not have the benefit of a transcript of the competency hearing held in the district court. If the hearing did, in fact, occur, it may have shed some light on defense counsel's thinking on the subject of defendant's competency. See MCR 7.210(B)(1)(a) ("The appellant is responsible for securing the filing of the transcript . . . ."). Further, defendant did not proffer an opinion from a mental health expert that defendant was not competent to stand trial based on his mental health history. Additionally, Dr. Brewer's

---

[6] We note that this would have been more than 15 years before the offenses were committed.

[7] This Court's review is limited to the record developed in the trial court, and we generally cannot consider documents outside the record. MCR 7.210(A); *Wiand v Wiand*, 178 Mich App 137, 143; 443 NW2d 464 (1989).

evaluation that defendant was "feigning psychiatric, neurological, cognitive and amnestic disorders" may have reasonably dissuaded defense counsel from pursuing an independent competency evaluation. Next, the mental health diagnosis defendant relied on is from 2014, but the trial took place in 2018, leaving us to question the relevancy of defendant's mental state in 2014.[8] Finally, and importantly, defendant fails to persuasively link his alleged mental health history and the circumstances surrounding the offenses to an inability to understand the nature and object of the proceedings or an inability to assist in his defense in a rational manner. Depression and anger would generally not render a defendant incapable of understanding court proceedings and assisting in a defense. Indeed, defendant fails to assert or show that he did not understand the proceedings or was unable to assist in his defense. In sum, we cannot conclude that defense counsel's failure to request an independent competency evaluation fell below an objective standard of reasonableness, nor that there existed a reasonable probability that, but for counsel's alleged error, defendant would have been found incompetent to stand trial.

With respect to the defense of legal insanity, defendant argues that defense counsel should have sought a criminal responsibility evaluation, which apparently led to an unfavorable result for defendant in the St. Joseph County case, and he should have pursued a legal insanity defense. Although Dr. Brewer's evaluation concerned competency to stand trial, aspects of the evaluation, e.g., malingering, feigning disorders, and acknowledging intoxication, certainly did not lend support for raising an insanity defense. Also, defendant did not present the opinion of an expert who, on the basis of the circumstances surrounding the offenses and defendant's mental health history, opined that defendant was not criminally responsible. Moreover, the mental health diagnosis relied on by defendant is from 2014, but the offenses took place in 2017, again leaving us to question the relevancy of defendant's mental state in 2014. Additionally, and importantly, defendant fails to persuasively link his alleged mental health history and the circumstances surrounding the offenses to a lack of substantial capacity to appreciate the nature and quality of the wrongfulness of his conduct or to conform his conduct to the requirements of the law.[9] Finally, the evidence regarding defendant's behavior during and after the murders

---

[8] With respect to the text messages from 2017, we note that the comments by defendant's ex-wife about his alleged instability and anger do not provide any context in regard to times and dates. The DOC records showing the medications that defendant is currently taking pertain to a period after the crimes were committed and perhaps are reflective of the fact that he must spend the rest of his life in prison.

[9] As one example, assuming that defendant was suffering from intermittent explosive disorder at the time of the offenses, we note that defendant does not provide us with the information necessary to conclude that intermittent explosive disorder can cause a person to lose the capacity to conform his or her conduct to the requirements of the law. Some expertise is needed to first understand the nature of the disorder and to then make the correlation between the disorder and the legal standards. As a second example, even though defendant is currently prescribed Zoloft, Depakote, and Remeron through the DOC, defendant has provided nothing, even in his outside-the-record attachments, showing that not being on these particular drugs would have made him unable to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law.

revealed that he appreciated the nature and quality of the wrongfulness of his conduct: he had fled both crime scenes and headed south, and he told a South Bend police officer that he "need[ed] to be in jail." Moreover, the fact that defendant voluntarily turned himself into the police in South Bend was evidence that he indeed had the capacity to conform his conduct to the requirements of the law. In sum, we cannot conclude that defense counsel's failure to request a criminal responsibility evaluation and to pursue an insanity defense fell below an objective standard of reasonableness, nor that there existed a reasonable probability that, but for counsel's alleged errors, defendant would have been acquitted by reason of insanity.

In a Standard 4 brief, defendant also claims that defense counsel was ineffective for failing to respond to defendant when defendant asked him questions, failing to call witnesses in defendant's favor, failing to cross-examine witnesses, and for failing to present a viable defense. Defendant, however, does not present any supporting arguments, examples, or evidence. He fails to identify any occasion on which defense counsel did not or refused to answer a question or respond to a communication. Defense counsel's decision not to call witnesses at trial did not constitute deficient performance, and defendant fails to direct our attention to the names of any persons who could have provided testimony favorable to his defense. Next, defense counsel did cross examine several witnesses, including the intended victim and other eyewitnesses to the murder, regarding their ability to observe the incident and identify defendant. With regard to the witnesses that defense counsel did not engage in cross-examination, defendant fails to set forth questions that should have been asked of those witnesses. Finally, defense counsel did present a defense by challenging the evidence regarding premeditation and deliberation in an attempt to spare defendant a mandatory life sentence. Once again, the evidence of defendant's guilt was overwhelming, and defense counsel could only do so much in defending against the charges. In sum, defendant fails to establish the factual predicate of his claims and fails to overcome the presumption that defense counsel's decisions and actions constituted sound trial strategy.

In his Standard 4 brief, defendant next argues that there was insufficient evidence to support the conviction of first-degree premeditated murder. We review de novo the issue regarding whether there was sufficient evidence to support a conviction. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012); *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992). Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "All conflicts in the evidence must be resolved in favor of the prosecution." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

Defendant essentially argues that the evidence was insufficient to show that the bullet fired from his gun was the one that killed the victim. In support, defendant claims that there were multiple gunshots, that there were two other individuals seen with guns, that he only fired once, that the discovered bullet was negative for blood, and that there were no fingerprints or DNA found on the recovered handgun. Defendant also contends that three witnesses at the scene never identified defendant as being present when the shooting occurred, but he then maintains that "they all commit[ted] perjury."

Identity is an element of every offense, *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008), and the first-degree murder charge required proof that defendant caused the victim's death, M Crim JI 16.1(2). Defendant's own confessions to multiple police officers that he shot the victim when aiming at her brother provided evidence that he was the shooter and that he caused the victim's death. Additionally, the intended victim, who was very familiar with defendant, testified that he observed defendant wield the handgun and fire, followed by his sister's collapse. This evidence also established defendant's identity as the shooter who caused the victim's death. Another witness at the scene further identified defendant as the person who fired the gun that killed the victim. Moreover, a bullet recovered from the crime scene was consistent with the handgun found in defendant's car, again tying defendant to the murder. To the extent that there was conflicting evidence, e.g., witnesses who heard multiple gunshots instead of just one, we are constrained to resolve all conflicts in favor of the prosecution. *Kanaan*, 278 Mich App at 619. And any issues regarding credibility and the weight of the evidence were for the jury to assess and not this panel. *Wolfe*, 440 Mich at 514-515. In sum, we hold that there was sufficient evidence to support the conviction of first-degree murder.

Finally, defendant argues in his Standard 4 brief that he is entitled to a new trial because the evidence obtained from the search of his vehicle and used against him at trial was discovered as the result of an unconstitutional search. The substance of defendant's argument, however, is simply that the description and location of the evidence found in his car by officers in South Bend, as documented by those officers, varied from the description and location of the evidence later gathered from the car by officers in Kalamazoo, as documented by those officers. Thus, according to defendant, the evidence discovered in his car had been "tampered with" by the police. In cursory fashion, defendant then states, "I do believe this goes against the Four[th] and Fourteen[th] Amendment[s] . . . and the evidence should be dismissed." This legal argument is wholly undeveloped and the issue is inadequately briefed; therefore, we deem the argument abandoned. See *People v Hicks*, 259 Mich App 518, 532; 675 NW2d 599 (2003) ("A party may not announce a position on appeal and leave it to this Court to unravel or elaborate his claims."). At most, defendant's claims merely revealed conflicts in the testimony and created credibility issues, all matters for the jurors to assess. It appears that pieces of evidence may have been moved around inside the car from the time it was first searched in South Bend until it was later examined by Kalamazoo police officers.

In sum, we conclude that there is absolutely nothing in the record suggesting the existence of an unconstitutional search or any other constitutional infringement. Lastly, assuming for the sake of argument that the evidence discovered in defendant's car should have been suppressed, we find the presumed plain error on this unpreserved issue was harmless. Admission of the car-related evidence did not affect defendant's substantial rights in light of his

confessions and the eyewitness testimony, which all served to establish defendant's guilt beyond a reasonable doubt. *Carines*, 460 Mich at 763-764.

We affirm.

/s/ Christopher M. Murray
/s/ Jane E. Markey
/s/ Jane M. Beckering